UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                 :

ONE STEP UP, LTD.,                 :

                           :        21-CV-5392 (AKH) (RWL)

               Plaintiff,    :

                           :

      - against -     :    **REPORT AND RECOMMENDATION**

                           :    **TO HON. ALVIN K. HELLERSTEIN:**

EMPIRE APPAREL LLC, ASSAF COHEN,  :    **MOTION FOR SUMMARY**
and STEPHANIE GOLDMAN       :    <u>**JUDGMENT (DKT. 146)**</u>

                           :

               Defendants.  :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

After a falling out in the parties' business relationship, One Step Up Ltd. ("One Step") filed this action against Empire Apparel LLC ("Empire Apparel"), its principal Assaf Cohen, and its employee Stephanie Goldman, asserting claims for, *inter alia*, trademark infringement, unfair competition, and fraud. One Step moved for summary judgment on all but one of its claims pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion should be DENIED as to all claims but granted with respect to the likelihood of confusion and dilution elements of One Step's trademark claims.

**FACTUAL BACKGROUND**[1]

**A.    The Parties**

One Step is a wholesale apparel company, which designs, manufactures, and distributes branded clothing and footwear. (Adjmi Aff. ¶ 4.) The company has hundreds

---

[1] The facts are drawn primarily from One Step's statement of undisputed material facts submitted pursuant to Local Rule 56.1 and Defendants' responses thereto. (*See* Dkt. 156 ("56.1 Statement").) Additionally, facts are drawn from the parties' supporting affidavits and exhibits thereto. The affidavits include, *inter alia*: the declaration of attorney Yvette J. Sutton in support of Plaintiff's motion for summary judgment at Dkt. 147 ("Sutton Decl."); the supplemental declaration of Sutton in support of Plaintiff's motion for summary

of employees and "operates through various 'divisions' that reflect the type of merchandise being sold." (Adjmi Aff. ¶ 5.)  One Step is run by its founder and Chief Executive Officer, Harry Adjmi.  (Adjmi Aff. ¶¶ 1, 4.)  Youn Choi is One Step's Chief Financial Officer.  (Choi Aff. ¶ 1.)  Abraham ("Abe" or "Abie") Sultan runs his own division at One Step and is Adjmi's nephew.  (*See* Sutton Decl., Ex. 9 ("Yoo Tr.") at 25; Suppl. Sutton Decl., Ex. A ¶ 31.)

Empire Apparel is also in the wholesale apparel business but "primarily focused on buying and selling women's 'close-out' apparel." (Cohen Decl. ¶ 3.)  "Close-out refers to orders that are placed with a manufacturer, but subsequently canceled by either the manufacturer or buyer, leaving the manufacturer with unsold merchandise." (Cohen Decl. ¶ 4.)  Empire Apparel purchases close-out merchandise directly from manufacturers and resells the apparel to specialized retailers.  (Cohen Decl. ¶¶ 5-6.)  Cohen is Empire Apparel's principal.  (*See* Sutton Decl., Ex. 4 ¶ 4.)  As discussed in greater detail below, Empire Apparel has employed Goldman at various times since 2015.  (Sutton Decl., Ex. 8 ("Goldman Tr.") at 14.)

In addition to the parties, three non-party companies are implicated in the dispute. Interstate Equities LLC ("Interstate") "was a wholesaler of various consumer goods" to

---

judgment at Dkt. 161 ("Suppl. Sutton Decl."); the affirmation of Harry Adjmi in support of Plaintiff's motion for summary judgment at Dkt. 147-11 ("Adjmi Aff."); the declaration of Harry Adjmi in support of Plaintiff's motion for summary judgment at Dkt. 162 ("Adjmi Decl."); the affidavit of Jung Ryu (aka Johnny Yoo) at Dkt. 147-12 ("Yoo Aff."); the affirmation of Youn Choi in support of Plaintiff's motion for summary judgment at Dkt. 147-13 ("Choi Aff."); the declaration of Stephanie Goldman in opposition to Plaintiff's motion for summary judgment at Dkt. 157 ("Goldman Decl."); the declaration of Assaf Cohen in opposition to Plaintiff's motion for summary judgment at Dkt. 158 ("Cohen Decl."); and the declaration of attorney Gerald Grunsfeld in opposition to Plaintiff's motion for summary judgment at Dkt. 159 ("Grunsfeld Decl.").

whom One Step and Empire Apparel sold apparel.  (56.1 Statement ¶¶ 39, 45.)  Joel Gross is Interstate's last remaining officer.  (Sutton Decl., Ex. 10 ("Gross Tr."), at 8.)

LA Fashion Hub, Inc. ("LAF") is another apparel company to whom One Step and Empire Apparel sold merchandise.  (56.1 Statement ¶ 56.)  An individual known as "Benny" was Cohen's contact at LAF.  (56.1 Statement ¶ 54; *see also* Sutton Decl., Ex. 31.)

Bow Wow Style I Inc. ("Bow Wow") is a clothing manufacturer which sold millions of units of apparel to One Step and Empire Apparel between 2017 and 2020.  (56.1 Statement ¶ 62; Yoo Aff. ¶¶ 3-4.)  Jung Ryu aka Johnny Yoo ("Yoo") is the President of Bow Wow and was Defendants' contact at the company.  (56.1 Statement ¶ 63; Yoo Aff. ¶ 1.)

## B.    Empire Division

In 2013, Adjmi and Cohen established a business relationship between One Step and Empire Apparel which would eventually be known as Empire Division.[2]  (Adjmi Aff. ¶¶ 14-15; Cohen Decl. ¶¶ 8-9.)  In essence, Empire Apparel was responsible for the day-to-day sourcing, purchasing, and selling the merchandise for Empire Division, while One Step provided the capital, warehousing services, and back-office functions, and "controlled all aspects of [Empire Division's] finances."  (56.1 Statement ¶¶ 6-7.)  The

---

[2] In their submissions, Defendants refer to the business relationship as the "Joint Venture," rebuffing the term Empire Division.  (*See generally* 56.1 Statement.)  For clarity and tracking with the terminology used in the contemporaneous record (*see, e.g.*, Sutton Decl., Ex. 17), the Court refers to the arrangement as Empire Division.  Additionally, as noted below, the Court does not rule on whether the Empire Division is merely a division of One Step or an independent entity (i.e., a joint venture).

3

parties split profits.[3]  (56.1 Statement ¶ 4.)  A written agreement was prepared by a One Step executive to formalize Empire Division but never signed.[4]  (56.1 Statement ¶ 5.)

Instead, the parties relied on an oral agreement, the terms of which were memorialized in an email sent by Cohen.  Those terms provide that:

(a)    Empire Apparel will be responsible to buy, <u>sell</u> and inspect merchandise from the market;
(b)    [One Step] will pay, ship and bill merchandise;
(c)    Profits will be split 50/50 after <u>all</u> costs incurred (merchandise, freight, duty);
(d)    No interest will be accrued for capital;
(e)    Empire apparel has 6 months from date Received to sell merchandise; after 6 months the merchandise has not been sold Empire will start incurring warehouse/storage expenses;
(f)    One step up and any affiliated company will agree to a non-circumvent agreement.

(56.1 Statement ¶ 4; *see also* Adjmi Aff. at ECF 17.)  At some point in 2014, the parties revised the financial terms of Empire Division.  The parties agreed One Step could deduct 12% of Empire Division's revenues as a fee to account for its overhead costs.  (Cohen Decl. ¶ 40; Choi Aff. ¶ 5; Sutton Decl., Ex. 4 ¶¶ 17-18.)

In the first half of 2020, and after many profitable years, Empire Division sales declined significantly.  (56.1 Statement ¶ 23.)  In June 2020, the Empire Apparel - One Step relationship broke down altogether and Cohen terminated Empire Division by letter, citing "unreconciled accounting" discrepancies.  (Sutton Decl., Ex. 4 at ECF 26-27; *see also* 56.1 Statement ¶¶ 15-17.)  A month later, Empire Apparel sued One Step for breach

---

[3] In a joint statement of material facts filed in the State Action described below (the "JSMF"), One Step and Empire Apparel describe in greater detail Empire Division's accounting methods and their related disputes.  (*See* Sutton Decl., Ex. 4 ¶¶ 32-45.)

[4] Among other terms, the written agreement stated that "[n]othing herein contained shall be construed or deemed to constitute a partnership or joint venture between the parties." (Adjmi Aff. at ECF 25.)

of contract in New York state court, and One Step asserted counterclaims.  (56.1 Statement ¶ 20.)  *See also Empire Apparel, LLC v. One Step Up, Ltd.*, Index No. 652901/2020 (N.Y. Sup. Ct. New York Cnty.) (the "State Action").

## C.    Goldman's Employment

In May 2015, Empire Apparel hired Goldman as an assistant.  (Goldman Tr. 14.) Between 2015 and the first half of 2017, Goldman, as an Empire Apparel employee, performed various administrative tasks, including data entry and reception, for Empire Apparel, One Step, and Empire Division.  (Goldman Tr. 15, 20-22.)

In June 2017, as part of an agreement between Cohen and Adjmi, Goldman was transferred from Empire Apparel's payroll to One Step's.   (Cohen Decl. ¶ 40; 56.1 Statement ¶¶ 12, 18; Goldman Tr. 20.)  Goldman continued to perform work for Empire Apparel after the transfer, including by assisting Cohen in selling merchandise on behalf of Empire Apparel (i.e., separate from One Step or Empire Division).  (Cohen Decl. ¶¶ 40-41; Adjmi Aff. ¶ 70; Goldman Tr. 21-22 (testifying that the only change in her job as a result of the transfer was a "a difference in paycheck from a different company"); 56.1 Statement ¶ 22.)  The parties dispute, however, if, while receiving a W-2 income from One Step, Goldman was permitted to perform this work for Empire Apparel. Characterizing the transfer as an administrative and financial change, Cohen asserts that he and Adjmi agreed Goldman could continue to "do work for Empire [Apparel] … individually."  (Cohen Decl. ¶ 40; *see also* Goldman Decl. ¶ 5 ("both [One Step] and Empire [Apparel] were free to have me perform tasks" and One Step "was fully aware that I performed administrative work on behalf of Empire [Apparel]").)  Adjmi claims to have not known "that Cohen utilized [One Step's] W-2 employee, Stephanie Goldman … to assist with Empire [Apparel]'s sales outside the [Empire Division]."  (Adjmi Aff. ¶ 70.)

5

From the start of 2020 through her departure from One Step in June of that year, Goldman received $17,596.77 in W-2 wages from One Step. (56.1 Statement ¶ 14; Adjmi Aff. at ECF 31; Goldman Tr. 23.) As of the date of her deposition on May 12, 2023, Goldman was again employed by Empire Apparel, now as an office manager. (Goldman Tr. 14.)

**D.    The Trademarks**

In 2015 and 2016, Cohen developed two brand names for Empire Division, "Bushwick Industries" (the "Bushwick Mark") and "Essenza" (the "Essenza Mark" and, together with the Bushwick Mark, the "One Step Marks"). (Cohen Decl. ¶¶ 20, 24.) One Step, through Cohen, applied to the U.S. Patent and Trademark Office ("PTO") to register the One Step Marks in the clothing category. (56.1 Statement ¶ 9.)

The Bushwick Mark was successfully registered to One Step on August 25, 2020, under U.S. Registration No. 6136500. (Sutton Decl., Ex. 15 (the "Bushwick Mark File") at ECF 1.) The Essenza Mark, however, proved problematic. One Step filed its registration application for the Essenza Mark on November 17, 2015 (the "Essenza Application"). (Sutton Decl., Ex. 16 (the "Essenza File") at ECF 1.) The PTO denied the Essenza Application, because of a likelihood of confusion with an existing registered mark in violation of Section 2(d) of the Lanham Act. (Essenza File at ECF 1, 7.) *See* 15 U.S.C. § 1052(d). The PTO explained that "ESSENZA," which is Italian for "essence," is likely to be confused with a third party's registered mark in "ESSENCE" under U.S. Registration No. 1204615 (the "Essence Mark"). (Essenza File at ECF 7-9.)

In December 2019, Empire Apparel and Cohen created a new brand, "Bushwick Supply", and began using the brand in commerce the following month. (56.1 Statement ¶¶ 25-26; Sutton Decl., Ex. 18 ("Bushwick Supply File") at ECF 77.) One Step was not

6

involved in these sales.  (56.1 Statement ¶ 21 & nn.1, 2.)  On February 2, 2020, Empire Apparel applied to register Bushwick Supply as a trademark.  (56.1 Statement ¶ 27.)  The PTO refused the Bushwick Supply application due to likelihood of confusion with the existing Bushwick Mark.  (56.1 Statement ¶ 34; *see also* Bushwick Supply File at ECF 1.)

Even after termination of Empire Division in June 2020, Empire Apparel continued shipping apparel marked with the Bushwick Supply brand and the One Step Marks.  (56.1 Statement ¶¶ 29-30, 33.)  The parties dispute the amount of any profit Empire Apparel earned from these sales.  (*See* 56.1 Statement ¶ 36.)

### E.    The Interstate And LAF Sales

In October 2019, Cohen sold approximately 88,487 units of Empire Division merchandise to LAF (the "LAF Goods").  (56.1 Statement ¶¶ 56-57.)  In November 2019 and March 2020, Cohen sold more than 69,000 units of Empire Division merchandise to Interstate (the "Interstate Goods").  (*See* 56.1 Statement ¶¶ 45, 48.)  Cohen sold the LAF and Interstate Goods at prices below what One Step paid suppliers for Empire Division to initially acquire the goods and for as low as 50 cents per unit.  (*See* Sutton Decl., Exs. 25, 32; 56.1 Statements ¶¶ 46, 57.)

Cohen later assisted LAF in selling the LAF Goods to retailers at significantly higher prices and received a portion of the profits.  (*See* 56.1 Statement ¶ 59; Cohen Decl. ¶ 31.)

Empire Apparel also developed a business relationship with Interstate (the "Empire-Interstate Partnership") where, much like Empire Division, Empire Apparel sourced and/or sold product on behalf of the Empire-Interstate Partnership.  (56.1 Statement ¶¶ 41-43.)  On behalf of the Empire-Interstate Partnership, Cohen resold the

Interstate Goods to retailers and made a profit which was divided between Empire Apparel, Interstate, and Cohen's brother, Eric Cohen.  (56.1 Statement ¶¶ 50-51.)

**F.    The Bow Wow Scheme**

From 2017 to 2020, Cohen arranged for Empire Division to purchase millions of units of apparel from Bow Wow across dozens of purchases.  (Cohen Decl. ¶ 28; Yoo Aff. ¶ 4; Yoo Tr. at 29-30.)  Yoo, Bow Wow's principal, believed Cohen owned One Step and negotiated the sales exclusively with him.  (Yoo Tr. 15, 19.)  Once the pricing terms were finalized, Goldman sent Yoo purchase orders, and Yoo provided corresponding invoices.  (Yoo Tr. 19-20.)  One Step, on behalf of Empire Division, paid Bow Wow's invoices by wire transfer.  (Yoo Tr. 77.)

According to Yoo, in 2018, One Step paid "Bow Wow more than the amount set forth on [One Step's] purchase orders" on one or two occasions.  (Yoo Aff. ¶ 8; Yoo Tr. 27-30.)  Yoo believed Cohen and/or Goldman "accomplish[ed] this by inputting inflated prices into the [One Step] computer generated purchase order and payment systems."[5] (Yoo Aff. ¶ 9.)  Yoo returned these overpayments directly to Cohen in cash.  (Yoo Tr. 27, 29-31.)  Cohen did not return these payments to One Step.  (56.1 Statement ¶ 68.) According to Yoo, Bow Wow paid Cohen over $100,000 on account of One Step's overpayment.  (Yoo Aff. ¶ 9.)

Cohen and Goldman deny ever devising this scheme, fraudulently inputting inflated prices into One Step's system, or receiving any improper payments from Bow Wow.  (Cohen Decl. ¶ 28; Goldman Decl. ¶ 3.)

---

[5] In his deposition, Yoo testified that he did not know why he would receive a payment different from the agreed upon price, nor did he know who at One Step did (or even could) change prices in its system.  (Yoo Tr. 80.)

After the termination of Empire Division, Empire Apparel continued to do business with Bow Wow until, according to Cohen, One Step encouraged Bow Wow to terminate its relationship with Empire Apparel. (Cohen Decl. ¶ 28; *see also* Yoo Tr. 24-25, 53.) As of his deposition, Yoo continued to do business with Sultan's division at One Step. (Yoo Tr. 24-25, 74-75.)

## PROCEDURAL BACKGROUND

One Step filed an initial complaint on June 18, 2021. (Dkt. 1.) The operative Third Amended Complaint ("TAC") was filed on May 23, 2025. (Dkt. 135.) The TAC includes claims for federal trademark infringement (Count 1) and false designation of origin (Count 2), common law trademark infringement (Count 3) and unfair competition (Count 4), dilution (Count 5), deceptive acts and practices (Count 6), declaratory judgment (Count 7), fraud (Counts 8 and 9), unjust enrichment (Count 10), conversion (Count 11), and faithless servant (Count 12).[6] (*Id*.)

On July 16, 2025, One Step moved for summary judgment on all but one of its claims and filed an accompanying memorandum of law ("Pl. Mem.").[7] (Dkts. 146, 149.) On October 13, 2025, Defendants filed their opposition papers, including a brief ("Opp."). (Dkt. 160.) One Step filed a reply on November 13, 2025 ("Reply"). (Dkt. 163.) The motion for summary judgment was referred to the undersigned for a Report and Recommendation. (Dkt. 114.)

---

[6] Counts 1, 2, 3, 4, 5, 6, 7, 10, and 11 are asserted against Empire Apparel and Cohen. Count 8 is asserted against Cohen and Goldman. Count 9 is asserted against all Defendants. Count 12 is asserted only against Goldman.

[7] One Step does not seek summary judgment on Count 6, its claim for Deceptive Acts and Practices under New York General Business Law ("G.B.L.") § 349. (Pl. Mem. at 1 n.1.)

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). The Court's task is not to resolve contested issues of fact, but rather to determine whether there exists any disputed issue of material fact. *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986). "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citation omitted). A dispute "is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *Federal Deposit Insurance Corp. v. Great American Insurance Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex*, 477 U.S. at 323). Once that burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson*, 477 U.S. at 249).

"'All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party.'" *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415, 427 (2d Cir. 2009) (quoting *Horvath v. Westport Library Association*, 362 F.3d 147, 151 (2d Cir. 2004)). However, "[t]o defeat a summary

judgment motion, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Federal Deposit Insurance Corp.*, 607 F.3d at 292 (first quoting *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986), then quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248; *see also Knight*, 804 F.2d at 11-12 ("'the mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment'") (alteration omitted) (quoting *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)).

## DISCUSSION

One Step has moved for summary judgment on its Lanham Act claims for trademark infringement and false designation of origin and its state law claims for trademark infringement and unfair competition, dilution, unjust enrichment, fraud, conversion, faithless servant, and declaratory judgment. Many of these claims involve overlapping factual issues and related legal questions. Accordingly, the Court's analysis proceeds in four parts. First, the Court considers One Step's claims concerning the disputed trademarks and attendant damages. Second, the Court considers One Step's fraud claim arising out of the purported Bow Wow scheme. Third, the Court considers One Step's claims involving the LAF and Interstate transactions. Finally, the Court addresses One Step's faithless servant claim against Goldman.

11

Cutting to the chase, the parties have provided wholly contradictory accounts of the facts underlying each of these events, precluding summary judgment as to liability on all of One Step's claims, even if not on every element of each claim.

## A.    Trademark Claims

One Step seeks summary judgment on six Counts grounded in trademark rights: trademark infringement (Count 1), false designation of origin (Count 2), common law trademark infringement (Count 3), common law unfair competition (Count 4), dilution under N.Y. G.B.L. § 360-l (Count 5), and declaratory judgment determining the parties' rights concerning the Bushwick Supply mark (Count 7).  (*See* Pl. Mem. at 11-18.)  The Court first analyzes the ownership and protectability of the One Step Marks – threshold issues for each  trademark-related claim – and finds there are genuine issues of material fact precluding summary judgment on those issues.  The Court then addresses whether Defendants' use of both the One Step Marks and the Bushwick Supply mark caused likelihood of confusion, and determines that there are no genuine disputes of material fact as to that element.  Finally, the Court addresses the parties' arguments concerning One Step's trademark damages.

### 1.  Trademark Principles

The Lanham Act (or, the "Act") protects both registered and unregistered trademarks.[8]  *See* 15 U.S.C. §§ 1051 *et seq*.  To prevail on a claim for infringement of a

---

[8] In relevant part, the Act defines "trademark" as "any word, name, symbol, or device, or any combination thereof … used by a [natural or juristic] person … to identify and distinguish [their] goods … from those manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.  "The main difference [between registered and unregistered marks] is that the owner of the unregistered mark does not benefit from the presumption of validity created by federally registering the mark."  *Now-Casting*

registered trademark under Section 32(a) of the Lanham Act, or of an unregistered mark under Section 43(a), "a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5), without the plaintiff's consent" and that the "defendant's use of that mark is likely to cause confusion."[9]  *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks, citation, and ellipses omitted); *see also BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp.3d 508, 520 (S.D.N.Y. 2019).

To determine whether a mark is "distinctive" and thus entitled to protection, courts consider, "in an ascending order which roughly reflects their eligibility to trademark status," whether the mark is "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Generic marks – those which refer only to "the genus of which the particular product is a species" – are not entitled to protection under the Lanham Act or at common law.  *Id.* Descriptive marks are entitled to protection only where they have acquired a "secondary meaning."  *Id.*  And marks which are suggestive, arbitrary, or fanciful are considered "inherently distinctive and are entitled to protection."  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753 (1992).  "Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product through the

---

*Economics, Ltd. v. Economic Alchemy LLC*, 628 F. Supp.3d 501, 516 (S.D.N.Y. 2022) (subsequent history omitted).

[9] Section 32(a) is codified at 15 U.S.C. § 1114(a); Section 43(a) is codified at 15 U.S.C. § 1125(a).  Section 2 of the Lanham Act, which is addressed below and governs the standards for registration, is codified at 15 U.S.C § 1052.

use of imagination, thought and perception." *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 385 (2d Cir. 2005) (internal quotation marks and citation omitted). A mark is arbitrary or fanciful if it does "not communicate any information about the product either directly or by suggestion." *Id.*

As to ownership, the "party who first uses a mark in commerce is said to have priority over other users." *Hana Financial, Inc. v. Hana Bank*, 574 U.S. 418, 419, 135 S. Ct. 907 (2015). "A certificate of registration with the PTO is prima facie evidence that the mark is … valid (*i.e.*, protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *see also* 15 U.S.C §§ 1115(a), 1057(b). Upon presentation of a registration certificate, the burden shifts to the defendant to rebut protectability and ownership by a preponderance of the evidence. *Lane Capital*, 192 F.3d at 345; *Vincent's of Mott Street, Inc. v. Quadami, Inc.*, 423 F. App'x 46, 50 (2d Cir. 2011) (summary order); *Johnson & Johnson Consumer Companies, Inc. v. Aini*, 540 F. Supp.2d 374, 389 (E.D.N.Y. 2008)*.*

To determine whether the likelihood of confusion requirement is satisfied, courts in this Circuit balance the eight factors described in *Polaroid Corp. v. Polarad Electronics Corp*: 1) the strength of the mark, 2) degree of similarity between the two marks, 3) proximity of the products in the marketplace, 4) likelihood that the prior owner will bridge the gap, 5) actual confusion, 6) defendant's intent in adopting its mark, 7) the quality of defendant's product, and 8) the sophistication of the relevant consumer. 287 F.2d 492, 495 (2d Cir. 1961); *see also Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 115-17 (2d Cir. 2023).

Courts employ substantially similar standards when analyzing claims for trademark infringement and unfair competition under New York common law. *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 101 n.6 (2d Cir. 2010) (trademark infringement claims brought under the Lanham Act and New York common law are "composed of the same elements"). However, bad faith is required under New York common law, whereas it is only a factor in the holistic *Polaroid* analysis. *See Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp.3d 422, 446 (S.D.N.Y. 2020) ("The same standards that govern a Lanham Act claim apply to a claim of unfair competition under New York common law, except common law requires a showing of bad faith or intent") (internal quotation marks omitted).

"To prevail on a claim for trademark dilution under New York law, the plaintiff[] must show (1) that it possesses a strong mark – one which has a distinctive quality or has acquired a secondary meaning ... and (2) a likelihood of dilution by either blurring or tarnishment."[10] *Kaplan, Inc. v. Yun*, 16 F. Supp.3d 341, 352 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also* N.Y. G.B.L. § 360-l. Blurring occurs when "the defendant uses … plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002) (quoting *Deere & Co. v. MTD Products, Inc.*, 41 F.3d 42 (2d Cir. 1994)); *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp.3d 425, 460 (S.D.N.Y. 2017) (noting the blurring test largely overlaps with the *Polaroid* factors).

---

[10] "Unlike federal trademark dilution law, … New York's trademark dilution law does not require a mark to be 'famous' for protection against dilution to apply." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). As discussed below, however, the renown of a junior mark is a factor in assessing likelihood of dilution.

15

### 2. There Is A Genuine Dispute Of Material Fact Concerning Ownership Of And Defendants' Right To Use The One Step Marks

One Step argues that it is the exclusive owner of the Bushwick Mark and the Essenza Mark, and that Empire Apparel therefore was not entitled to use those marks outside of Empire Division.[11]  (Pl. Mem. at 12-13; Reply at 2-4.)  The Court considers the marks in turn and determines that there is a genuine dispute of material fact as to ownership of both.

Starting with the Bushwick Mark, One Step is the presumptive owner.  That is because the Certificate of Registration (the "Certificate") for the mark identifies One Step as the registrant.  (Bushwick Mark File at ECF 4.)  *See also* 15 U.S.C. § 1115(a); *Lane Capital*, 192 F.3d at 345.  Defendants do not question the authenticity of the Certificate, that it was properly issued by the PTO, or that the Bushwick Mark is inherently distinctive. (56.1 Statement ¶ 10.)  Instead, Defendants argue that, notwithstanding the Certificate, Empire Division – which they characterize as a joint venture between Empire Apparel and One Step – owns the One Step Marks.  (Opp. at 1-3.)

As factual support, Defendants rely on the Cohen Declaration.[12]  (*Id.*)  There, Cohen describes, *inter alia*, how he devised the One Step Marks for Empire Division;

---

[11] Defendants do not argue that they had a license to use the One Step Marks, but rather that the parties agreed to co-own the marks.  In its reply brief, One Step asserts that, "even if Empire [Apparel] had a limited license to use [One Step]'s Marks, which it did not, any license terminated when Empire [Apparel] severed its relationship with [One Step]." (Reply at 3.)

[12] In support of their argument that Empire Apparel co-owns the One Step Marks, Defendants cite *Zioness Movement Inc. v. Lawfare Project, Inc.*, No. 21-CV-7429, 2024 U.S. Dist. LEXIS 95766, at *2 (S.D.N.Y. May 30, 2024) (Hellerstein, J.).  That decision stands for the propositions that multiple entities can own a trademark, and a co-owner cannot sue the other for infringement.  *Id*.  The opinion does not, however, shed light on the present dispute (i.e., whether both parties are, on the facts of this case, co-owners of the mark).  Relatedly, One Step correctly notes that joint ownership of a trademark is

16

used the One Step Marks on behalf of Empire Division and Empire Apparel, individually; understood Empire Division to be a joint venture; decided to register the One Step Marks; believed he had arranged for counsel to register the marks on behalf of Empire Division (i.e., list Empire Apparel and One Step as co-owners); and, that both One Step and Empire Apparel could use the marks individually. (*See* Cohen Decl. ¶¶ 20-26.) Cohen also avers that he and Adjmi "agreed that the brand names would belong to both Empire [Apparel] and [One Step]." (Cohen Decl. ¶ 20; *see also id.* ¶ 23 ("[One Step] and EMPIRE [APPAREL] had a clear agreement that both parties shared ownership of all the profits/assets of the JOINT VENTURE, including [the One Step Marks]").)

One Step characterizes the Cohen Declaration as "self-serving" and contradicted by the contemporaneous record and Defendants' prior submissions.[13] (Reply at 1.) Specifically, One Step points out that **Cohen** helped arrange for registration of the One

---

generally disfavored given the main purpose of trademarks is to identify the single source of the product. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:40 (5th ed. 2017). Co-ownership, however, is not unlawful, nor is ownership of a mark by a joint venture or other juridical entity. *See id.*; *Zioness Movement Inc. v. Lawfare Project, Inc.*, 746 F. Supp.3d 125, 132 (S.D.N.Y. 2024) (Hellerstein, J.) ("As a matter of law, co-ownership [of a trademark] is permissible") (citing cases), *aff'd*, No. 24-974, 2025 WL 2327522 (2d Cir. Aug. 13, 2025).

[13] One Step does not argue that the Cohen Declaration constitutes a "sham affidavit" notwithstanding the fact that it is in tension with some of Cohen's deposition testimony. (*See* Sutton Decl., Exs. 5-7 ("Cohen Tr.") at 24 (Cohen testifying "I believe" One Step owns the Bushwick Mark), 157 (similar regarding the Essenza Mark). *But see id.* at 33-34 (describing the One Step Marks as registered to One Step but "for the [joint venture's] benefit"), 45 (asserting that One Step never used the One Step Marks), 52 (expressing confusion regarding the meaning of trademark ownership), 149-152 (asserting only Empire Division and Empire Apparel used the One Step Marks and expressing regret regarding registering the marks to One Step).) *See also McDermott v. This Dog's Life Corp.*, No. 23-CV-5869, 2025 WL 3096448, at *12 (S.D.N.Y. Oct. 28, 2025) (declining to apply the sham affidavit doctrine where declarant expressed confusion regarding the implications of copyright registration).

Step Marks *to One Step*, evidencing the parties' understanding that One Step owned the marks.  (*See* Sutton Decl., Ex. 17 at ECF 14 (Empire Apparel employee informing counsel, and cc'ing Cohen, that "[w]e are developing additional [brands] and would like you to register Bushwick Industries to [One Step]"), 1-3 (Cohen and counsel discussing registration of the Essenza Mark); Sutton Decl., Ex. 40 ¶¶ 11-12 (Cohen describing why Empire Division decided to register the marks to One Step).  While circumstantial, One Step also argues that Cohen created the "knock-off" Bushwick Supply brand because he did not have rights to the Bushwick Mark; and, One Step surmises, if Cohen did have rights to the Bushwick Mark, he certainly would have informed the PTO of that fact after the PTO denied his Bushwick Supply application due to likelihood of confusion with the Bushwick Mark.  (Reply at 2-3.)  These arguments are compelling and buttressed by the testimony of Adjmi.  (*See* Adjmi Aff. ¶¶ 16-22.)

Even so, Defendants have established a genuine dispute of material fact as to whether the parties agreed to be co-owners of the One Step Marks.  *See Blue Planet Software, Inc. v. Games International, LLC*, 334 F. Supp.2d 425, 437 (S.D.N.Y. 2004) (recognizing contractual arrangements can supersede the "statutory presumptions afforded registrations"); *Vincent's of Mott St.*, 423 F. App'x at 50 ("parties may allocate rights in a trademark through private agreement" notwithstanding registration).  Specifically, the two principals whose oral agreement is at-issue – Adjmi and Cohen – have provided contradictory accounts of whether the parties agreed to co-own the One Step Marks (including as joint venturers).[14]  (*Compare* Adjmi Decl. ¶ 5 ("At no time did I,

---

[14] Neither party's briefing squarely addresses whether Empire Division qualified as a joint venture, or if it is better characterized as a simple financing arrangement with a profit-

or anyone at [One Step], ever agree that [the One Step Marks] would be jointly owned by [Empire or Cohen]") *with* Cohen Decl. ¶ 20 ("[Adjmi and I] agreed that the brand names would belong to both Empire and [One Step]").)

Cohen's involvement in registering the marks is not conclusive evidence of the parties' contractual arrangement concerning ownership; it is plausible that Cohen did not understand the implications on ownership of registering (or attempting to register) the One Step Marks to One Step. (*See, e.g.,* Cohen Tr. 52 (expressing confusion regarding the meaning of trademark ownership), 149-152 (asserting only Empire Division and Empire used the One Step Marks, and expressing regret regarding registering the marks to One Step); Cohen Decl. ¶¶ 21-22 (stating "it never occurred to me to ask counsel to list both [One Step] and EMPIRE as the co-owners of the mark," and that Cohen subsequently learned that only One Step was listed as the owner of the mark).) Moreover, the terms governing Empire Division do not address ownership (or licensing) of the One Step Marks. (*See* Adjmi Aff. at ECF 17.)

This factual dispute – which turns on determinations of credibility and the weighing of conflicting evidence regarding the nature of Empire Division, its use of the One Step Marks, and the parties' agreement – must be resolved by a jury. While the Court is somewhat skeptical of Cohen's account considering One Step's documentary evidence, the Federal Rules require that for this motion the evidence be construed in the manner most favorable to the nonmoving party, *Okin*, 577 F.3d at 427, and do not permit the Court to weigh credibility and resolve genuine factual disputes.

---

sharing component, and the Court does not do so here. That fact-intensive issue is the subject of a robust dispute in the State Action. *See, e.g.,* State Action, Dkts. 109, 145.

The same conclusion applies to the Essenza mark. Indeed, given the Essenza Mark never received a registration, One Step is not entitled to the presumption of ownership. Accordingly, One Step bears the full burden to prove ownership at trial.

### 3. One Step Has Failed To Establish As A Matter Of Law That The Essenza Mark Is Protectible

Apart from the ownership issue, the parties dispute whether the Essenza Mark is entitled to protection. Because the Essenza Mark is unregistered, there is no presumption of protectability, and "the burden is on plaintiff to prove that its mark is a valid trademark." *Franklin v. X Gear 101, LLC*, 2018 WL 3528731, at *11 (S.D.N.Y. July 23, 2018) (quoting *Reese Publishing Co. v. Hampton International Communication, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980)). One Step argues that the Essenza Mark is inherently distinctive. (Pl. Mem. at 12-13.) Defendants do not say otherwise, and the Court agrees. In the parlance of trademark law, "ESSENZA" is arbitrary or fanciful, or at least suggestive. *See Star Industries*, 412 F.3d at 385.

Defendants point out, however, that the PTO rejected the Essenza Application and declined to register the Essenza Mark because of likelihood of confusion with the Essence Mark, citing Section 2(d) of the Lanham Act.[15] (Def. Mem. at 3-4; Essenza File at 7.) From this denial of registration, Defendants conclude (albeit without legal citation or elaboration) that the Essenza Mark does not warrant protection. (Def. Mem. at 4.) That argument is sufficiently viable that One Step is not entitled to summary judgment on whether the Essenza Mark is protectible.

---

[15] Defendants accuse One Step of "conveniently omit[ting]" the fact that the Essenza Mark is unregistered. (Def. Mem. at 4.) That is not so. (*See* Pl. Mem. at 12; Essenza File.)

20

The Supreme Court has instructed "that the general principles qualifying a mark for registration under [Section] 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection." *Two Pesos*, 505 U.S. at 768; *see also Courtenay Communications Corp. v. Hall*, 334 F.3d 210, 214 n.2 (2d Cir. 2003) ("an unregistered mark is entitled to … protection if it would qualify for registration"). A growing number of courts, including a court in this District and the *en banc* Federal Circuit, have indicated that this language – and the Act itself – port the statutory requirements of registration in Section 2 to Section 43(a).[16] *See In re Tam*, 808 F.3d 1321, 1344 & n.11 (Fed. Cir. 2015) (en banc) (subsequent history omitted) (doubting plaintiff could bring a Section 43(a) infringement claim for a trademark which does not qualify for registration under Section 2(a) of the Lanham Act); *Renna v. County of Union, New Jersey*, 88 F. Supp.3d 310, 321 (D.N.J. 2014) ("a mark that does not qualify for registration under Section 2 also does not qualify for protection under Section 43(a)"); *Bangkok Bangkok Import & Export Inc. v. Jamtan African American Market Corp.*, No. 16-CV-2657, 2016 WL 8814348, at *5 (S.D.N.Y. June 17, 2016) ("Because Plaintiff's mark is not suitable for registration …, the mark also is not suitable for protections"). Here, the PTO thoroughly and persuasively described why the Essenza Mark was not entitled to registration under Section 2(d) of the Act, and One Step does not challenge that finding before this Court. (*See* Essenza File at 7-10.)

Instead, on reply, One Step primarily argues that "registration is not a prerequisite to protection." (Reply at 5.) That uncontroversial observation misses the point. The

---

[16] The Supreme Court declined to weigh in on this question, at least as it related to Section 2(a)'s prohibition on disparaging marks. *See Matal v. Tam,* 582 U.S. 218, 226 n.1, 137 S. Ct. 1744 (2017) (invalidating disparagement clause on other grounds).

question is not whether the Essenza Mark needs to be registered (it does not), but rather whether a mark that does *not* qualify for registration under the Lanham Act is entitled to protection.  One Step cites to *Murphy Door Bed Co., v. Interior Sleep Systems, Inc.* for the proposition that the "denial of registration by the [PTO] does not affect" plaintiff's rights.  687 F. Supp. 754, 759 (E.D.N.Y. 1988) (hereinafter *Murphy*), *aff'd in part and rev'd in part*, 874 F.2d 95 (2d Cir. 1989).  While the quoted language appears favorable to One Step at first glance, *Murphy* is inapposite.[17]  There, the parties disputed whether the surname "Murphy" had transformed into a generic term for a wall bed (i.e., a "Murphy Bed").  The PTO found that it had and, thus, determined that the mark was not entitled to protection and denied the registration.  Even after affording weight to the PTO appeal board's rationale, the district court disagreed and determined that the Murphy mark was not generic.  *Id.* at 762.  Here, in contrast, One Step does not present any argument in its briefing that the PTO erred in its determination that the Essenza Mark is not entitled to registration under Section 2 of the Act.

For this additional reason – lack of protectability – One Step is not entitled to summary judgment on its Lanham Act claims related to the Essenza Mark.[18]

---

[17] The decision in *Murphy* does not provide any legal citation for the quoted language which, in this Court's view, was intended to convey that registration is distinct from and thus not a prerequisite for protection.  Additionally, the relevant portion of the *Murphy* analysis – that having to do with the genericness of the at-issue mark – was reversed on appeal.  *See Murphy Door Bed Co., Inc. v. Interior Sleep Systems, Inc.*, 874 F.2d 95, 104 (2d Cir. 1989).

[18] Defendants did not affirmatively move for summary judgment on any issue, including protectability of the Essenza Mark, instead merely opposing One Step's motion.  The Court therefore does not render a determination as to whether One Step's claim for infringement of the Essenza Mark should be dismissed.

**4. There Is No Genuine Dispute Of Material Fact Concerning Likelihood Of Confusion And Dilution**

One Step has established – and Empire Apparel has not argued to the contrary – that, assuming One Step were to succeed in proving sole ownership, Empire Apparel's use of the One Step Marks and Bushwick Supply mark was likely to cause confusion under the *Polaroid* test.   (Pl. Mem. at 12-17 (applying the *Polaroid* factors); *see also* Opp. (failing to dispute likelihood of confusion or address any *Polaroid* factor).)   The Court considers Empire Apparel's use of the One Step Marks and Bushwick Supply mark separately and in brief.   Given the issue of likelihood of confusion is not disputed, the Court need not mechanically address each factor.  *See Topps Co. Inc. v. Gerrit J. Verburg Co.*, No. 96-CV-7302, 1996 WL 719381, at *6 (S.D.N.Y. Dec. 13, 1996) ("Where the marks are identical, and the goods are also identical and directly competitive, the decision [regarding likelihood of confusion] can be made directly without a more formal and complete discussion of all of the *Polaroid* factors").

There is no dispute that Cohen and Empire Apparel used identical marks – the One Step Marks – on the same type of goods and targeted the same sorts of customers with whom One Step (or Empire Division) did business. (*See e.g.*, 56.1 Statement ¶¶ 21 n.1, 29-31, 33.)  Because Cohen was permitted to use the One Step Marks in connection with Empire Division but (according to One Step) not on behalf of Empire Apparel, the situation is analogous to cases where a licensee infringes on the licensor's trademark by selling goods with identical marks outside the scope or duration of its license. In such circumstances, Courts find likelihood of confusion established as a matter of law.  *See Halo Optical Products, Inc. v. Liberty Sport, Inc.*, No. 6:14-CV-282, 2017 WL 1082443, at *11 (N.D.N.Y. Mar. 22, 2017) ("it is well established that when a licensee uses a mark

beyond the scope permitted in the licensing agreement, the consumer confusion requirement is satisfied"); *L&L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp.2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law").

As for the Bushwick Supply mark, the Court agrees with the PTO that the mark is likely to be confused with the Bushwick Mark.  (Sutton Decl., Ex. 18 at ECF 5-7.)  *See also City of New York by & through FDNY v. Henriquez*, 98 F.4th 402, 414 (2d Cir. 2024) (courts in the Second Circuit afford "great weight" to PTO conclusions and "depart from them only for 'compelling' reasons") (quoting *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 165 (2d Cir. 2016)).  Among other factors, the Bushwick Mark is strong because it is arbitrary and fanciful; the two marks are similar "in appearance, sound, connotation, and commercial impression" given "the dominant word in both marks is Bushwick"; the marks are used on similar goods that compete in the same market for close-out clothing; and there is unrebutted evidence that Defendants' use of the Bushwick Supply mark caused at least one or two instances of actual confusion.  (Sutton Decl., Ex. 18 at ECF 6-7; Ex. 21 (third-party merchants evidencing confusion regarding whether One Step or Empire is the vendor of certain merchandise).)  *See Polaroid*, 287 F.2d at 495.

The same conclusions apply to the second element of One Step's dilution claim: likelihood of dilution.  The standard to establish the likelihood of dilution through blurring largely overlaps with the *Polaroid* test, with the key difference being that New York law also considers, as an additional non-dispositive factor, the renown of the junior mark.  *See Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp.2d 305, 330 (S.D.N.Y. 2000)

24

("The only factor without a counterpart among the *Polaroid* factors is the renown of the junior trademark"), *aff'd sub nom.*, *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262 (2d Cir. 2000); *Mintable Pte. Ltd. v. Mintology Inc.*, No. 23-CV-8215, 2024 WL 3454825, at *10 (S.D.N.Y. July 18, 2024) (observing the "first five [of six] factors [for blurring under New York law] bear a marked similarity to the *Polaroid* factors," and only addressing the renown of the junior mark); *Coty*, 277 F. Supp.3d at 460 (similar).

The parties have not proffered any evidence as to whether the junior mark is renowned. Where, as here, the *Polaroid* factors that overlap with the dilution factors weigh in favor of likelihood of confusion but there is no evidence of whether the junior mark is renowned, the Court's *Polaroid* analysis suffices to establish likelihood of dilution, and One Step is entitled to summary judgment on the likelihood of dilution element. *See Mintable*, 2024 WL 3454825, at *10 (holding "in combination with the Court's prior 'likelihood of confusion analysis,' the Court finds that Plaintiff has established Defendant's liability for state law trademark dilution by blurring" where there were no facts with respect to renown of defendant's mark); *FiberMark, Inc. v. Brownville Specialty Paper Products, Inc.*, No. 7:02-CV-517, 2006 WL 659514, at *7 (N.D.N.Y. Mar. 13, 2006) (finding likelihood of dilution by blurring where "no evidence was proffered," as to renown of the junior mark).

Accordingly, likelihood of confusion and likelihood of dilution are not disputed issues requiring trial. One Step is entitled to summary judgment on those elements.

### 5. Summary Judgment Should Not Be Granted On The Amount Of One Step's Trademark Damages

For its trademark claims, One Step seeks to recover its actual damages (i.e., lost profits), Defendants' profits, enhanced damages, and attorneys' fees and interest. (Pl. Mem. at 24-27.) Because the Court concludes that there are issues of fact precluding

summary judgment on liability as to the trademark-related claims, the Court declines to address the amount One Step's damages, if any, or to, as One Step requests, "schedule a hearing to determine the precise amount of recoverable damages." (Reply at 13.) The Court does address, however, Defendants' argument that One Step should be precluded from asserting trademark-related damages altogether as a sanction for failing to adequately disclose its damages as required by Rule 26. (*See* Def. Mem. 10-13.)

Rule 26(a) requires a plaintiff to disclose "a computation of each category of damages claimed," as part of its initial disclosures, and permit inspection of the documents used to calculate those damages. Fed. R. Civ. P. 26(a)(1)(A)(iii); *see also New York v. United Parcel Service, Inc.*, 942 F.3d 554, 591 (2d Cir. 2019); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). Under Rule 37(c)(1), a noncompliant party may be precluded from using undisclosed information "on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Preclusion under Rule 37 is not mandatory, *see Design Strategy*, 469 F.3d at 297, and the trial court maintains "broad discretion to determine the nature of any sanction that should be imposed." *Cates v. Trustees of Columbia University in City of New York*, 330 F.R.D. 369, 373 (S.D.N.Y. 2019) (internal quotation marks omitted); *see also Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (holding the decision to exclude testimony under Rule 37(c)(1) is within the trial court's discretion and listing factors relevant to the analysis); *Ebewo v. Martinez*, 309 F. Supp.2d 600, 607 (S.D.N.Y. 2004) ("Courts in this Circuit recognize that preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution").

26

Defendants take issue with One Step's initial disclosure enumerating its damages and their subsequent failure to supplement that disclosure.  In its initial disclosure on November 1, 2021,[19] One Step characterized its damages as follows:

> That [One Step] be awarded from Defendants three times [One Step's] damages from and three times of each of Defendants' profits there from, after an accounting, or, in the alternative statutory damages, should [One Step] opt for such relief, consisting of Two Hundred Thousand Dollars ($200,000.00) from each of the [One Step Marks] and to the extent this Court concludes such infringement was willful, Two Million Dollars ($2,000,000.00), for the BUSHWICK INDUSTRIES mark infringed upon by Defendants, pursuant to 15 U.S.C. §§1114, 1117 and 1125(a).

(Grunsfeld Decl., Ex. BB at ECF 6.)  On December 25, 2024, Defendants requested One Step supplement the disclosure with a "detailed categorization/itemization/calculation of any damages Plaintiff has sustained as a result of any of Defendants' alleged [wrongdoing]."  (Grunsfeld Decl., Ex. CC.)  One Step did not respond to the request.

Defendants contend that One Step's initial disclosure failed to alert Defendants to One Step's lost profits theory or provide a sufficient computation of damages, and argue this resulted in "significant[] prejudice[]."  (Def. Mem. at 13.)  One Step responds that its disclosures were sufficient because they "identified the categories and statutory bases for the damages sought" and "further detail depended on information within [Defendants'] control."  (Reply at 10.)  One Step does not explain, however, why it declined to

---

[19] Per the Court's then-operative case management plan, One Step's initial disclosure was due on October 15, 2021.  (*See* Dkt. 21.)  Although Defendants highlight One Step's service of its initial disclosure 18 days after the due date, Defendants do not articulate any prejudice resulting from the delay or explain their own failure to raise the issue for almost four years.

supplement its disclosure at the close of discovery or upon defense counsel's explicit request.

Because the Court recommends denying One Step's motion for summary judgment as to liability on the trademark claims and therefore finds it premature to consider damages, Defendants have not suffered prejudice from One Step's purported discovery infractions as it relates to the instant motion.  Accordingly, Defendants' bid to preclude the damages claim is denied without prejudice to renewing the request as a motion in limine before trial.  At that juncture, and with the benefit of complete briefing,[20] the Court will be best situated to determine whether One Step's Rule 26 disclosure was deficient and, if so, the appropriate remedy.

In sum, issues of ownership and protectability preclude summary judgment on One Step's trademark-related claims.  Summary judgment should be denied with respect to Counts 1-5 and 7, except for the elements of likelihood of confusion and likelihood of dilution as to which there are no genuine disputes.

## B.     The Bow Wow Scheme

One Step seeks liability on its fraudulent misrepresentation claim involving Bow Wow (Count 8).  One Step is not entitled to summary judgment on that Count; there is a genuine dispute of material fact concerning whether Cohen and Goldman even devised and executed the fraudulent scheme that One Step describes.

---

[20] Defendants raised their arguments concerning damages only in their opposition.  In doing so, they express concern that they "will not have a chance to respond to [One Step's] rebuttal."  (Opp. at 13.)  Additionally, Defendants' briefing primarily addresses prejudice as it relates to the instant motion; the calculus may differ as it relates to a future trial.

"Under New York law, a claim for fraud requires proof that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Pacific M. International Corp. v. Raman International Gems, Ltd*., 888 F. Supp.2d 385, 397 (S.D.N.Y. 2012) (internal quotation marks omitted).

Relying heavily on the Yoo Affidavit, One Step describes a scheme in which Cohen fraudulently caused One Step to overpay Bow Wow by entering inflated prices into One Step's payment system and then having Yoo return the overpayments directly to Cohen in cash.  (Pl. Mem. at 9-10.)  Yoo affirms that Bow Wow paid Cohen over $100,000 "on account of [One Step's] overpayments."  (Yoo Aff. ¶ 11.)  Yoo's affidavit includes two exhibits: "a schedule of goods [One Step] paid the inflated prices for," and "a compilation of purchase orders from [Empire Division] to Bow Wow list[ing] the correct purchase price."[21]  (*Id.* ¶¶ 12-13 & Exs. 1-2.)

Defendants argue – and provide some evidence suggesting – that One Step's factual assertions are entirely baseless, and that there were no fraudulently-inflated prices entered in One Step's system, undue payments to Cohen, or resulting injury to One Step. (Def. Mem. at 7-9.)  Cohen affirms that "Yoo / Bow Wow never gave Defendants any money."  (Cohen Decl. ¶ 28; *see also* Goldman Decl. ¶ 3.)   Cohen explains that the discrepancies between the Bow Wow invoices and One Step's payments were the result

---

[21] The declaration also refers to a third exhibit ("a compilation of cash withdrawals and/or checks from Bow Wow's account that reflects the amounts paid back to Cohen"), but that exhibit was not included by One Step in support of its motion.  (Yoo Aff. ¶ 14; *see also* Sutton Decl. ¶ 15 (noting only Exhibits 1 and 2 to the Yoo Affidavit are included).)

of the "gap of many months between the initial order and the time the pricing was entered into the [One Step] system," during which time prices often fluctuated.  (Cohen Decl. ¶ 28; *see also* Cohen Tr. 202-204; Goldman Tr. 106, 111-12, 121-22 (describing why prices may have changed over time).)    According to Cohen's own calculations of these discrepancies, across all [One Step-Bow Wow] transactions, One Step paid *less* than initially invoiced.[22]  (Cohen Decl. ¶ 28 & Ex. B.)

Defendants also raise concerns regarding Yoo's affidavit.  Most notably, Yoo's deposition testimony suggests Yoo did not fully understand the declaration before signing it and, instead, blindly relied on Sultan to prepare the statement:

Q: Mr. Yoo, did you prepare the affidavit … ?

A: Did I prepare this one? No, I didn't.

Q: Do you know who prepared it?

A: Abie [Sultan].

Q: Did you read the affidavit before signing?

A: I told to Abie I don't understand all those things, you know. But Abie says it's okay to sign it because, you know, we're not going to sue you.

(Yoo Tr. 72.)  Yoo was also unable to explain some of the assertions in his declaration. For instance, a key claim is that Yoo provided Cohen with over $100,000 in cash for One Step overpayments.  Yet, when asked about this figure in his deposition, Yoo testified that he did not "remember how much I paid [Cohen]" and relied on Sultan to calculate the

---

[22] One Step derides these calculations as coming from a "self-prepared 'spreadsheet'" which does not constitute a business record.   (Reply at 8 (scare quotes in original).)  One Step's argument neglects the fact that Cohen's calculations are purportedly derived from records attached to One Step's Second Amended Complaint at Dkt. 42-7. (*See* Opp. at 8.)  Furthermore, One Step's claim relies heavily on similar spreadsheets purportedly created by Yoo which, as described below, are evidentiarily suspect.

payments based on Bow Wow records.  (Yoo Tr. 36.)  Yoo's failure to understand his declaration before signing it, and his inability to restate some of its most damning facts, call into question Yoo's credibility, to put it mildly.[23]

Relatedly, Defendants argue that Yoo had motive to fabricate testimony – or, at least, defer to One Step's narrative – because of his business relationship with Sultan's division at One Step.  (Def. Mem. at 7; *see also* Yoo Tr. 24-26.)  Yoo's deference to Sultan and uninformed signing of the declaration adds persuasive force to this argument.

In conclusion, given Cohen's testimony that he never arranged or received any kickback from Bow Wow, and the circumstances surrounding Yoo's declaration and conflicting deposition testimony, the Court finds a genuine dispute of material fact concerning the entire existence of the purported scheme.  Summary judgment on Count 8 therefore should be denied.

## C.    Interstate And LAF Scheme

One Step's claims for fraud (Count 9), unjust enrichment (Count 10), and conversion (Count 11) concern Empire Division's sales of the Interstate and LAF Goods (the "Sales").  While the elements of those three causes of action vary from each other,[24]

---

[23] The Court also notes that this testimony is seemingly inconsistent with Plaintiff's counsel's representation that the Bow Wow "scheme only came to light … when Jonny [sic **Yoo provided [One Step] with an affidavit** detailing the arrangement."  (Pl. Mem. at 10 (emphasis added).)

[24] "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000).  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50, 860 N.E.2d 713 (N.Y. 2006); *see also Thyroff v. Nationwide Mutual Insurance Co.*, 460 F.3d 400, 404 (2d Cir. 2006) (subsequent history omitted). The elements for fraud are outlined above in the context of discussing the alleged Bow Wow

they all fundamentally turn on whether Cohen acted inconsistently with the interests of Empire Division or, relatedly, outside the scope of his authorization. The parties sharply dispute facts material to that determination.

In One Step's telling, Cohen betrayed his obligations to One Step (and Empire Division) by selling the LAF and Interstate Goods at artificially low prices, with an eye towards later reselling the merchandise on behalf of competitors and reaping a profit at the expense of One Step. The parties do not dispute that Cohen orchestrated the Sales at atypically low prices, finalized one suspect transaction just days before he terminated Empire Division, and later profited from reselling the goods on behalf of Interstate and LAF at significantly higher prices. (56.1 Statement ¶¶ 17, 45-48, 51.) This series of events is consistent with a scheme whereby Cohen siphoned merchandise from Empire Division to enrich himself and deprive One Step of its due profits. (*See, e.g.,* Sutton Decl., Ex. 11 ("Sultan Tr.") at ECF 28-29 (describing Empire Division's sale and "unusually low" pricing of the Interstate Goods as a "red flag" and "aberration" even if not definitive proof of self-dealing), 34-36.)

Defendants, however, have provided evidence of an alternative – and far less nefarious – explanation for the Sales. In Cohen's telling, the LAF and Interstate Goods were initially sold in an arm's length transaction. (Cohen Decl. ¶¶ 32, 39.) The low prices reflected market conditions and Empire Division's desire to offload – in bulk – "goods that

---

scheme. Although One Step faults Defendants for failing to address the unjust enrichment and conversion claims separately from the fraud claim (Reply at 9), each claim rises or falls based on the same fundamental issue described above. If a jury accepts Defendants' position that the Sales were bona fide transactions (which Cohen had complete authority to enter into on behalf of Empire Division), no claim will lie for fraud, conversion, or unjust enrichment.

had been languishing in [One Step's] warehouse for nearly two years" and had been repeatedly marked down by Adjmi.  (Cohen Decl. ¶¶ 32-33.)  According to Cohen, only after completing these transactions and the termination of Empire Division did LAF and Interstate approach him to resell the goods.[25]  (Cohen Decl. ¶ 39.)  By that time, the prices for closeout clothing had rebounded as a result of supply shocks caused by the Covid-19 pandemic.  (Cohen Decl. ¶ 36.)  Interstate and LAF could also demand higher prices since they were selling the goods in smaller quantities to retailers and with little urgency.  (Cohen Decl. ¶ 36, *see also id.* ¶ 31 (Cohen describing that it sometimes took him "more than a year to find [an adequate] buyer" to whom Interstate and LAF could sell the goods at a higher price).)  If Cohen's version of events is true, his conduct was lawful and consistent with his obligations to One Step and authorization per the Empire Division's terms.  (56.1 Statement ¶ 4; *see also* Sultan Tr. at ECF 83 (Cohen had "full authorization to use his discretion to decide the appropriate pricing for the goods he was selling").)  Accordingly, no claim would lie for fraud, conversion, or unjust enrichment.

On reply, One Step relies on April and May 2020 email exchanges between Cohen and Gross to establish that Cohen fraudulently orchestrated (at least one) at-issue Interstate sale.[26]  One Step argues:

> On April 22, 2020, Cohen wrote to Gross: "Hi Joel, I was planning to put more units on another order. Am waiting as soon as we open back up. Thanks, Assaf." This statement is

---

[25] Consistent with this account, Gross testified that Interstate initially intended to sell the Interstate Goods on its own, and only reached out to Cohen after some delay. (Gross Tr. 111-12.) However, Gross was unable to point to any documentation showing Interstate's previous attempts to sell the Interstate Goods or establishing exactly when Interstate began working with Cohen.  (*See* Gross Tr. 122-27.)

[26] Plaintiff's opening brief makes only passing reference to this exchange.  (*See* Pl. Mem. at 7, 17.)

fatal. It shows that Cohen was creating and directing the purchase orders, "putting in" orders himself rather than responding to customer demand. The orders were a mechanism to move [One Step's] goods out before severing ties, not genuine third-party sales. That point is reinforced by Cohen's May 22, 2020 email to Interstate stating: "FYI I put this order in now..." This message, sent days before Cohen's termination, acknowledges that Cohen was using [One Step's] systems to process transactions that he personally initiated and controlled. These communications expose that Cohen fabricated purchase orders to strip [One Step] of inventory and later resell it through Empire.

(Reply at 7-8 (quoting Sutton Decl., Ex. 26).)  Having reviewed the exchange in its entirety, the Court agrees that Cohen's correspondence is suggestive of a cozy relationship between himself and Interstate prior to the termination of Empire Division and may be viewed as pointing in the direction of Defendants' culpability.  However, this evidence – construed in the light most favorable to Cohen and considering Cohen and Gross's testimony discussed above – is not so definitive that no reasonable jury could find for Defendants.  On one hand, Cohen's statement that he would "put more units on another order" could suggest his involvement in orchestrating a sham transaction.  On the other hand, the statement is vague and lacks context critical to its meaning.  For instance, Cohen may simply have been adding more units to another order for logistical purposes or per an arm's length agreement reached outside of the sparse and disjointed email exchange.

Once again, the parties offer evidence of conflicting versions of events which the Court cannot resolve at this stage.  Summary judgment should be denied as to Counts 9, 10, and 11.

34

**D.     Faithless Servant Claim**

Count 12 claims that Goldman was a faithless servant and that she should disgorge $17,596.77 in W-2 wages paid by One Step between January and June 2020. (Pl. Mem. at 24; Reply at 10.)  Genuinely disputed material facts require denying summary judgment on this claim as well.

New York's faithless servant doctrine permits an employer to recover all compensation paid to an employee during their period of disloyalty, regardless of any damages the betrayal may have caused.  *Torres v. Gristede's Operating Corp.*, 628 F. Supp.2d 447, 466 (S.D.N.Y. 2008).  New York courts apply two standards for determining whether the doctrine applies:

> "The first standard is met when the misconduct and unfaithfulness substantially violates the contract of service such that it permeates the employee's service in its most material and substantial part.  The second standard requires only misconduct that rises to the level of a breach of a duty of loyalty or good faith.  In other words, it is sufficient that the employee acts adversely to his employer in any part of the transaction or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment."

*Stanley v. Skowron*, 989 F. Supp.2d 356, 359-60 (S.D.N.Y. 2013) (internal quotation marks, citations, ellipses, and brackets omitted).

One Step's faithless servant claim is premised on Goldman's participation in the Bow Wow scheme, the Sales, and otherwise assisting Empire Apparel in 2020 while receiving W-2 income from One Step.  (*See* TAC at ¶ 168; Reply at 10.)  One Step argues that this conduct was unauthorized and contrary to the fiduciary duties Goldman assumed as a One Step employee.  It points to evidence, such as Goldman's W-2 pay stubs, emails

showing she assisted Empire Apparel in its sales, and Adjmi's testimony that he was unaware of Goldman's work on behalf of Empire Apparel. (Pl. Mem. at 23-24.)

Goldman raises two related arguments in opposition, both of which turn on facts that are in dispute. First, Goldman argues she was "not a [One Step] employee," but instead One Step paid her salary as part of an administrative arrangement between Cohen and Adjmi. (Opp. at 9 (citing Cohen Decl. ¶¶ 18, 40).) Second, Goldman argues that, even if she were a One Step employee, she was authorized by One Step to continue performing work for Empire Apparel. (Opp. at 9 (citing Cohen Decl. ¶¶ 40-42; Goldman Decl. ¶¶ 1-5).) There is evidence supporting those arguments.

As described above, Defendants have provided ample testimony that Goldman's transfer to One Step's payroll was simply a financial and administrative adjustment, and, critically, Cohen, Goldman, and Adjmi all understood that Goldman could continue assisting Empire Apparel in its business outside of Empire Division. (Cohen Decl. ¶¶ 40-41; Goldman ¶ 5; *see also* Goldman Tr. 20-21 (Goldman testifying that she "did pretty much the same thing" after the transfer and she continued to report to Cohen).) Given the parties' entangled business relationship and Goldman's inter-company responsibilities between 2015 and June 2020, this account is entirely plausible, even if it conflicts with Adjmi's version of events. (*See* Adjmi Aff. ¶ 70.) And, if Defendants' account is true, Goldman neither "violate[d her] contract of service" with One Step, breached a fiduciary duty, or otherwise acted adversely to One Step. *Stanley*, 989 F. Supp.2d at 359-60. Additionally, because the Court cannot conclude on the present record that either the Sales or Defendants' actions with respect to Bow Wow were

36

wrongful, Goldman's participation in those transactions cannot serve as an independent basis for a faithless servant claim at this stage.

One Step therefore is not entitled to summary judgment with respect to Count 12.

## CONCLUSION

For the foregoing reasons, One Step's motion for summary judgment should be DENIED on all claims and GRANTED only on the elements of likelihood of confusion and likelihood of dilution.  To the extent not discussed above, the Court has considered the parties' arguments and found them to be either moot or without merit.

## PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Any party shall have fourteen (14) days to file a written response to the other party's objections.  Any such objections and responses shall be filed with the Clerk of Court, with courtesy copies delivered to the Chambers of the Honorable Alvin K. Hellerstein, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any request for an extension of time for filing objections must be addressed to Judge Hellerstein.  **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

RESPECTFULLY SUBMITTED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  February 2, 2026
        New York, New York

Copies transmitted this date to all parties.